SECOMBE *v.* RAILROAD COMPANY.

1. When the question is whether, under the constitution and laws of a particular State, a company professing to be a corporation, is legally so, this court will receive as conclusive of the question, the decision of the highest court of the State deciding, in a case identical in principle, in favor of the corporate existence.

2. The taking of private property in order that a railroad may be made, belongs to the class of things which in proper cases are to be regarded as public necessities.

---

3. The *mode* of exercising the right of eminent domain, in the absence of any provision of organic law prescribing a contrary course, is within the discretion of the legislature. There is no limitation upon the power of the legislature in this respect if the purpose be a public one and just compensation be paid or tendered to the owner for the property taken.

4. A judgment of condemnation rendered by a competent court, charged with a special statutory jurisdiction, and when all the facts necessary to the exercise of the jurisdiction are shown to exist, is no more subject to impeachment in a collateral proceeding than the judgment of any other court of exclusive jurisdiction.

ERROR to the Circuit Court for the District of Minnesota; in which court Secombe brought ejectment against the Milwaukee and St. Paul Railway Company, to recover a lot in Minneapolis used by the company for a station.

The cause was heard by the court without the intervention of a jury.

It was admitted that Hiram Osborne and Ovid Pinney, under whom Secombe, by deeds of quitclaim made in 1870, claimed, had once been owners of the lot. But the railway company was now in possession of it, claiming under an act of condemnation made in 1867—three years before the deeds of quitclaim—in favor of the Minnesota Central Railway Company, in the alleged exercise of the right of eminent domain. The company defendant had succeeded to that company's rights.

Against the right of the Minnesota Central Railway Company, in whose favor the judgment of condemnation was entered, Secombe alleged:

1st. That under the constitution and laws of Minnesota the company was not a corporation, and, therefore, under the said laws not authorized to procure a condemnation in any form.

2d. That whether it was a corporation or not, all of the proceedings taken to obtain title to the lot were, under the said constitution and laws, void.

The case was thus:

In 1856, the territorial legislature of Minnesota incorporated a certain railroad company under a name then given to it.

In 1858, the Territory became a State and made a constitution.

This constitution prohibited the "*formation*" of corporations by *special act.**

It ordained also that " no person should be deprived of property without due process of law," and that private property should not be taken for public use without just compensation therefor " first paid or secured."†

About the same time, by a constitutional amendment, the State authorized the company above mentioned as incorporated by the Territorial legislature in 1856, and to which it had since made a loan of its credit by the issue of State bonds, for the payment of whose interest the company was to provide, to mortgage its roads, franchises, &c., to the State as security for payment of the principal and interest of the bonds.   The railroad company made the mortgage, but paid neither principal nor interest on the State bonds; and in 1860, the legislature of the State, by an act declaring that a default had occurred on the part of the company, in paying the interest on the bonds, directed the governor to foreclose the mortgage, and to bid in and purchase the roads and franchises in the name of the State.   This the governor did.

In the following year, 1861, the legislature by another act—a special act—which recited the act authorizing the foreclosure of the mortgage, and the purchase and acquisition of the road, its franchises, &c., by the State under the foreclosure—granted the road, its franchises, &c., to certain persons who had organized themselves into another company; the grant being subject to certain conditions, for the non-performance of which the grant was to be forfeited.

In 1862, the conditions having been broken, and a forfeiture having occurred, the road was regranted to a yet third set of persons organized into a new company, and called the Minnesota Central Railway Company.

It was this company which had caused the lot in question to be condemned for the purposes of its road; and the com-

* Article 10, section 2.                    † Ib., section 4.

pany derived its corporate existence under legislation of the same character as did the St. Paul and Pacific Railroad Company, which in the case of the *St. Paul and Pacific Railroad Company* v. *Parcher*,\* the Supreme Court of Minnesota held good and constitutional. That court considered that although corporations could not be formed by special act, yet that the State could buy the property including the franchise—or right to be a corporation of a corporation already created—and could hold without a merger, if it was for its interest and it desired to do so, the franchise which it had thus bought. It considered further that it was for the interest of the State to do so, because this would better enable it to secure the successful prosecution of important enterprises which it could not well carry on itself; while, that it was the intention of the State to keep alive the purchased franchise and hold it without merger, sufficiently appeared, the court thought, from legislation subsequent to the foreclosure. The court, in conclusion, said:

"There was no attempt here to create *new* corporate franchises, and thus to form and to bring into existence for the first time that which is the very essence of a corporation, and without which a corporation is nothing. But corporate franchises already in existence and held by the State as property, without merger in its general sovereignty and without extinguishment, were *transferred* to the persons enumerated in the act. This, we think, was a legitimate and constitutional transaction."

The part of the case relating to the proceeding of condemnation was thus:

An act of 1862 enacted :

"SECTION 10. The said company shall have the right of way upon any lands, to survey and lay down said road, not exceeding two hundred feet in width, and whenever it is necessary to have such lands, they shall have the right to enter upon, take and hold such lands, and occupy the same. When the same shall not be granted to said company, the compensation to be paid therefor shall be thus ascertained. The said company shall

---

\* 14 Minnesota, 297.

apply to the Judge of the District Court of the Territory of Minnesota, for the appointment of three commissioners, whose duty it shall be, to proceed to assess the damages which may be sustained by the several owners of the lands through which the road of said company is located. It shall be the duty of said company to give thirty days' notice of their application for the appointment of said commissioners, in one or more newspapers published in each of the counties through which said road is laid out; and it shall be the duty of such commissioners to cause ten days' notice of their meeting to appraise the damages of any land through which said road may run, to be given to the owner or claimant thereof. Either party feeling aggrieved by the decision of such commissioners, may appeal to the District Court of the county in which such land may be situated; and said appeal shall be tried in the same manner as if commenced therein. The notice to be given by the commissioners to the owners of lands required by the railroad, shall be in writing, and delivered to said owner or owners, or left at their usual place of residence; or if non-residents, then said notice shall be published in the nearest newspaper to where said land is situated, at least four weeks before making such appraisement."

The court below found as facts the following matters; this finding under the statute authorizing such finding of fact by the court, being in the nature of a special verdict:

1st. That, on the 26th of September, 1863, the company petitioned the District Court of the Fourth Judicial District of Minnesota, for the appointment of three commissioners to assess the damages which might be sustained by the owners of the land in question, by reason of the appropriation of it for railroad purposes.

2d. That the company had, previously to the said time, given thirty days' notice of their intended application, directed, among other persons, to Hiram Osborne and Ovid Pinney (the then owners), in the *State Atlas*, a newspaper published in the county.

3d. That the court appointed certain persons (named) as commissioners for the said purpose.

4th. That the commissioners, at least four weeks before the 2d day of December, 1863, published in the said *State*

*Atlas* notice of their meeting to appraise the damages of the said premises on the said 2d day of December, 1863, which notice was directed to Osborne and others, naming them. That Osborne could not be found in Minneapolis, and that his place of residence was unknown to the commissioners.

5th. That, on the 8th of April, 1864, the commissioners reported that they had awarded damages for the land entered upon and taken possession of by the company in the sum of $40; which report was, on the 16th day of April, 1864, filed with the clerk of the court.

6th. That, at a general term of the court, on the 20th of July, 1867, the court made an order that the award be confirmed, and judgment be entered thereon in conformity with the award, and that the $40 be paid into court by the company on the judgment to be entered, by leaving the same with the clerk thereof.

7th. That on the 22d of December, 1868, on motion of the company, a judgment was entered by the clerk in favor of the said Minnesota Central Railway Company, confirming the award, and directing that the said sum of $40 be paid into court by leaving the same with the clerk; and that the company at the time of the entry of judgment, paid into court the sum of $40.

8th. That the said judgment was thereupon docketed and satisfaction thereof entered by the clerk as against said company; and that a copy of the judgment, certified by the clerk, with his certificate that the same had been satisfied as against the said company by the payment of the said sum of money into court, was thereafter recorded in the office of the register of deeds of the said county.

No fact material to the issues appeared upon the trial other than the foregoing.

It was not shown upon the trial in any way or manner that Osborne or Pinney ever appeared in any of the said proceedings, or that any personal notice was ever given to or had by the said Osborne, of any of the said proceedings, or that any notice other than as aforementioned was given to or had by either of the said persons; or that the said

*State Atlas* was the nearest newspaper to where the premises described in the complaint were situated.

The court below gave judgment for the defendant, and from that judgment the case now came here.

*Mr. Secombe,* propriâ personâ, *plaintiff in error:*

1. *The Minnesota Railway Company, in whose favor the condemnation is alleged to have been made, had no corporate existence.*

The constitution of Minnesota ordains, in express terms, that railroad corporations shall not be formed by special law. Now this provision of fundamental law has been violated, if not in letter, certainly in spirit. No railroad corporation was, indeed, created in the exactly ordinary way, but there being a railroad corporation already in existence, with roads, franchises, and all other requisites of a railroad, under mortgage to the State, the mortgage is foreclosed, and the mortgaged property, including franchises and all other requisites, is bought by the State itself, and then, by a special act, it all is granted out to certain individuals, and in *St. Paul and Pacific Railroad* v. *Parcher,* this is held not to violate the provision of the constitution against the creation, by special law, of railroad corporations; but to be, all, "a legitimate and constitutional transaction!"

It would seem that the problem proposed to the Supreme Court of Minnesota for solution should be thus stated: "Given an express constitutional prohibition against the formation of a corporation by special act, in what way may that constitutional provision be defeated?"

The solution given by the court is ingenious, but seems to us to be in violation of the purpose of the constitutional provision thus avoided. It is a manner of dealing with a constitutional provision which should not, we think, commend itself to this court.

2. *The alleged manner of the attempted exercise of the right of eminent domain, and consequently the alleged divestiture of the plaintiff's right of possession was unconstitutional.*

There was not provided for by law a judicial trial, in determining the just compensation which should be paid for

the·taking of the private property in controversy in this case.

The constitution of Minnesota provides that no person shall be deprived of life, liberty, or property without due process of law; and this means a judicial trial. It is not necessary to assert in this case that a trial by jury is an essential part of that judicial trial. But it is absolutely necessary that there should be a proceeding in a court of competent jurisdiction, and that the party to be affected by the proceeding should be summoned into that court and have notice of the object of the proceeding.

The tenth section of the act of March 1st, 1856, which contains all that there is on the subject, provided that the judge of the District Court may be applied to, to appoint commissioners to assess the damages, and that a notice of this application shall be published in a newspaper. This act of the judge is purely ministerial, and his functions end with the appointment. This notice, which is only constructive in its nature, has expended its entire force when the appointment has been made. The commissioners thus appointed are required to give notice of their meeting to assess damages. The effect of this notice ends with the meeting which is the sole subject of the notice. An interested party may have happened to see the published notice of the application to the judge, and may have been present when the judge made the appointment. He may have had actual notice of the meeting of the commissioners, and have been present and seen them looking at the premises. But at this point the effect of the notice ends.

There is, it is true, an abortive attempt in the statute to give a judicial trial upon appeal to the District Court from the award of the commissioners, but there is an entire absence of any provision for notice to the landowner, which would require or enable him to take advantage of that opportunity. The commissioners are not required or authorized to make their award to the court, or to file it in the court or with the judge or clerk; nor are they required to notify in any way to the landowner the award or the making thereof. So that while there is here provided a proceed-

ing in court, there is no provision made for any notice by which the court could acquire jurisdiction of the person of the landowner in that proceeding.

3. *The laws under which the attempted exercise of the right of eminent domain was made are further void, because they authorize the taking of the property before making payment therefor.*

The constitution of Minnesota provides that private property shall not be taken for public use, without just compensation therefor, first paid or secured.

The act of March 1st, 1856, provides that the lands may be entered upon, taken, held and occupied, before any steps are taken for paying or securing the just compensation.

This is in direct violation of the constitution of Minnesota.

4. *In summary proceedings, under which the rights of parties are affected and divested, without their consent, a strict compliance with all the requirements of the statute must be shown by the party claiming title thereunder.*

The only provisions of law by which the rights of Secombe's grantors could be affected are those contained in the act of March 1st, 1856.

Now, there was a non-compliance with the foregoing provisions of law:

1st. In that the said commissioners did not, at the time of their meeting, or within a reasonable time thereafter, assess the damages to the said land. The meeting of the commissioners was on the 2d day of December, 1863; they did not make their award until more than four months thereafter.

2d. In that the commissioners awarded damages for the land which had been theretofore entered upon and taken possession of by the company, at the time when the same was so entered upon and taken possession of as aforesaid.

3d. In that the company did not, within a reasonable time thereafter, pay or tender to the landowner the damages so awarded. In order to acquire the right which the company was seeking under this law, it was the duty of the company at once to tender the landowner the amount of the award, to the end that if the landowner was satisfied with the

award he might have his money, and if he was not satisfied he might have his appeal from the award. Yet no payment was ever made or tendered to the landowner, nor was any notice ever given to or had by him, that any award had been made.

*Mr. F. R. E. Cornell, contra.*

Mr. Justice DAVIS delivered the opinion of the court.

The case was tried by the court without the intervention of a jury, and the only material point for inquiry is, whether on the whole case the decision of the court below, which was adverse to the plaintiff, was correct.

Whether the Minnesota Central Railroad Company, under whom the defendant claims—and which occupied for railroad purposes the land in question long before the deeds of quitclaim under which the plaintiff sets up title were made—whether this company had the right to condemn the land and took the proper steps to condemn it, depends of necessity on the laws of the State; and if these laws have been construed by the highest court of the State in a case similar in character to the one before us, the Federal courts are relieved of all difficulty.

We do not feel called upon to enter into an examination of the several acts on this subject, both public and private, which are quite numerous, in order to show that the Minnesota Central Company had a corporate existence, and was therefore capable of performing an act of condemnation. It is enough to say that the point is settled in favor of the company by the decision and reasoning of the Supreme Court of Minnesota in *St. Paul and Pacific Railroad Company* v. *Parcher.*

The Minnesota Central Company was authorized by law to procure the condemnation of land for the use of its road, and from the findings of fact by the Circuit Court it sufficiently appears that the statutory provisions on the subject were observed.

It is no longer an open question in this country that the

mode of exercising the right of eminent domain, in the absence of any provision in the organic law prescribing a contrary course, is within the discretion of the legislature. There is no limitation upon the power of the legislature in this respect, if the purpose be a public one, and just compensation be paid or tendered to the owner for the property taken. This general rule has received the sanction of the Supreme Court of Minnesota in analogous cases to the one at bar.*

It hardly need be said that the taking of private property in order that a railroad may be constructed, is a public necessity. It is urged that the property in controversy was occupied before the proceedings in condemnation were begun, but there is nothing in the findings of fact to show that this was so. Even if the plaintiff were in a situation to make the objection it would not avail him, for prior occupation without authority of law would not preclude the company from taking subsequent measures authorized by law to condemn the land for their use. If the company occupied the land before condemnation without the consent of the owners, and without any law authorizing it, they are liable in trespass to the persons who owned the land at the time, but not to the present plaintiff.

It is urged, also, against the validity of the award of the commissioners that it was not made in reasonable time, or the amount of it ever paid or tendered to the parties in interest. Whether this be so or not does not concern the plaintiff. It is enough for him to know that a judgment was entered confirming the award, and the money paid into the court for the use of Pinney and Osborne, and is there now unless they have seen fit to withdraw it. It is a fair presumption, as both these persons had notice, actual or constructive, of the proceedings in condemnation, and took no steps to review them, that they were either satisfied with the award or concluded they could not make successful opposition to it.

---

* Weir *v.* The St. Paul, Stillwater, and Taylor's Falls Railroad Co., 18 Minnesota, 155; Langford *v.* Commissioners of Ramsey County, 16 Id. 375.

This suit is an effort to question the propriety of the condemnation and sale of the property in a collateral proceeding, not by the party even whose land was appropriated, but by a stranger to the original proceeding, who, whatever his motive in buying, got no other estate than the original owners could convey—a fee subject to the easement of the railroad company. The judgment of condemnation in this case was rendered by a competent court, charged with a special statutory jurisdiction, and all the facts necessary to the exercise of this jurisdiction are shown to exist. A judgment thus obtained is no more subject to impeachment in a collateral proceeding than the judgment of any other court of exclusive jurisdiction.*

If it were so, railroad companies would have no assurance that the steps taken by them to procure the right of way would conclude any one, and they would be constantly subject to vexatious litigation.

Judgment affirmed.

---

* 1 Redfield on Railways, 5th edition, p. 271.